**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| INDIANA BELL TELEPHONE COMPANY, INCORPORATED doing business as AT&T INDIANA, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:15-cv-01832-TWP-DKL ) |
| CAROL STEPHAN, CAROLINE R. MAYS-MEDLEY, JIM HUSTON, ANGELA WEBER, and DAVID E. ZIEGNER, in their Official Capacities as Commissioners of the Indiana Utility Regulatory Commission and Not as Individuals, and SPRINT SPECTRUM, L.P., | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**ENTRY ON PLAINTIFF'S COMPLAINT**
**FOR DECLARATORY AND OTHER RELIEF**

This matter is before the Court on Plaintiff Indiana Bell Telephone Company, Inc.,

d/b/a AT&T Indiana's ("AT&T") request for review of an Arbitration Order and resultant

Interconnection Agreement issued by Defendants Carol Stephan, Caroline R. Mays-Medley, Jim

Huston, Angela Weber, and David E. Ziegner, in their Official Capacities as Commissioners of

the Indiana Utility Regulatory Commission and Not as Individuals the Indiana Utility Regulatory

Commission ("IURC"). (Filing No. 1.)  AT&T seeks a declaration that the IURC misapplied

federal law in an Arbitration Decision issued on August 5, 2015.  IURC and Defendant Sprint

Spectrum, L.P. ("Sprint") contend that the IURC properly applied federal law and that its findings

should be upheld.  For the reasons that follow, the Court **REVERSES** the challenged IURC

findings **and REMANDS** the matter to the IURC for further proceedings.

# I.  BACKGROUND

This administrative appeal involves the highly technical framework of the Telecommunications Act of 1996, 47 U.S.C. §§ 151 *et seq.* (the "Telecommunications Act").  The Court incorporates some relevant statutory background in its recitation of the facts, as it will assist the reader in making sense of both the terminology and the administrative framework that this matter has developed within.  *See SprintCom, Inc. v. Comm'rs of Ill. Commerce Comm'n,* 790 F.3d 751, 752-55 (7th Cir. 2015) (providing thorough description of statutory scheme and purpose).

Congress passed the Telecommunications Act in order to "promote competition in the previously monopoly-driven local telephone service market."  *Ind. Bell Tel. Co. v. McCarty,* 362 F.3d 378, 382 (7th Cir. 2004) (citing *Verizon Commc'ns, Inc. v. FCC,* 535 U.S. 467, 475-76 (2002)).  It did so by requiring existing local telephone service providers (the former monopolists, or incumbent local exchange carriers, "ILECs") to allow new entrants (or competitive local exchange carriers, "CLECs"), to use the ILECs' existing infrastructure.  *McCarty,* 362 F.3d at 382; *see also* 47 U.S.C. § 251(c)(2).  The ILECs must allow "interconnection" between the CLECs' and the incumbents' networks, enabling "the transmission and routing of telephone exchange service and exchange access."  47 U.S.C. § 251(c)(2)(A).  "This ensures that customers on a competitor's network can call customers on the incumbent's network, and vice versa."  *Talk Am. Inc., v. Mich. Bell Tel. Co.,* 564 U.S. 50, 54 (2011).

"Telephone exchange service" is telephone service within a local "exchange" (service) area.  47 U.S.C. § 153(54).  "Exchange access" is the access to the local exchange that ILECs provide to long distance companies.[1]  47 U.S.C. § 153(20).  By regulation, the Federal Communications Commission ("FCC") has defined "interconnection" to mean "the linking of two

---

[1] Carriers that provide long-distance services are called "interexchange carriers," or "IXCs".

networks for the mutual exchange of traffic." 47 C.F.R. § 51.5.  Such interconnection occurs at "entrance facilities," which are "the transmission facilities (typically wires or cables) that connect competitive [C]LECs' networks with [I]LECs' networks." *Talk Am.,* 564 U.S. at 54.  In order to "make the interconnection requirement as inexpensive for new entrants as possible," the FCC requires that ILECs charge the CLECs certain cost-based rates, known as "TELRIC rates" for the use of certain of their facilities. *SprintCom*, 790 F.3d at 753-54 (citing 47 C.F.R. §§ 51.501, 51.503).

A.     **Statutory Framework**

Section 252 describes the procedure by which a competing carrier enters into an interconnection agreement with an ILEC.  47 U.S.C. § 252.  First, the requesting party sends a request to negotiate.  47 U.S.C. § 252(a)(1).  If the parties cannot arrive at an interconnection agreement through negotiation, either party may petition the state utility commission to arbitrate any open issues.  47 U.S.C. § 252(b)(1).  The non-petitioning party is allowed to respond, 47 U.S.C. § 252(b)(3), after which the state commission then rules on the open issues by applying federal law and FCC regulations.  47 U.S.C. § 252(c)(1), (d).  After the state commission resolves the arbitration, the parties submit an interconnection agreement for the commission to review.  47 U.S.C. § 252(e)(1).  The state commission may then approve or reject the interconnection agreement after applying the criteria outlined in Section 252(e)(2).  If the state commission does not approve or reject the interconnection agreement within 30 days, the agreement is deemed approved.  47 U.S.C. § 252(e)(6).  Any aggrieved party may then bring an action in federal district court to determine whether the agreement meets the requirements of Section 251.  47 U.S.C. § 252(e)(6).

3

**B.** **Procedural History**

AT&T is an ILEC under the Telecommunications Act.  (Filing No. 1 at 2.)  Sprint is a provider of Commercial Mobile Radio Service in Indiana and other states, and now competes with AT&T, the former monopolist incumbent.  (Filing No. 1 at 2.)  Sprint requested negotiations with AT&T for an interconnection agreement to succeed the parties' then-existing agreement.  (Filing No. 1 at 5.)  Negotiations did not result in an agreement, and Sprint filed a Petition for Arbitration with the IURC.  (Filing No. 1 at 5.)  The parties filed written testimony in support of their positions on the remaining issues.  (Filing No. 1 at 5.)  On August 5, 2015, the IURC issued its arbitration order (the "Arbitration Order") that resolved all open issues.  (Filing No. 1 at 6.)

In order to implement the requirement of Section 251(c)(2) in its negotiations with Sprint, AT&T proposed language in the interconnection agreement making clear that "Sprint was entitled to use TELRIC-priced entrance facilities only for traffic mutually exchanged between the parties' end user customers."  (Filing No. 28 at 6.)  Importantly, this excluded "traffic between Sprint's end user customers and a long distance carrier … where Sprint sought merely to use AT&T Indiana's network as an intermediary."  (Filing No. 28 at 6.)  Sprint raised two arguments in opposition to AT&T's proposed language.  First, Sprint argued that Section 251(c)(2) encompasses any traffic that Sprint may deliver through an AT&T Indiana switch, regardless of whether it is between end-user customers.  The IURC rejected this interpretation, but held instead, per Sprint's alternative argument, that as long as Sprint is using a TELRIC-priced entrance facility for *some* permissible traffic, then it would be entitled to use the facility to exchange other types of traffic as well.  (Filing No. 24-8 at 28.)  The IURC also determined that AT&T would be required to bear 50% of the cost of the entrance facilities used by Sprint.  (Filing No. 24-8 at 33.)

4

On October 5, 2015, the parties filed the conforming interconnection agreement for review by the IURC. (Filing No. 28 at 4.) The IURC did not act to approve or reject the interconnection agreement, so it was deemed approved. (Filing No. 28 at 4.) AT&T now challenges certain findings made by the IURC as contrary to federal law. (Filing No. 1.)

## II.  **STANDARD OF REVIEW**

This Court reviews *de novo* the state commission's interpretations of the Telecommunications Act and the FCC's regulations. *Ind. Bell Tel. Co. v. McCarty*, 362 F.3d 378, 385 (7th Cir. 2004). The Court reviews questions of fact under the arbitrary and capricious standard. *Id.* Under this standard, the Court may not substitute its judgment for the arbitrator's. *Id.* But while the Court's review is highly deferential, "it is not a rubber stamp," and the Court will not uphold the arbitrator's decision if "there is an absence of reasoning in the record to support it." *Cerentano v. UMWA Health & Ret. Funds,* 735 F.3d 976, 981 (7th Cir. 2013) (internal quotations and citations omitted).

## III.  **DISCUSSION**

On appeal, AT&T challenges two of the IURC's decisions: (1) that Sprint is permitted to exchange traffic at TELRIC-based rates for traffic other than that between the parties' end-user customers; and (2) that AT&T is required to pay 50% of the cost of use of the Section 251(c)(2) interconnection facilities. (Filing No. 28.)

## A.  **Use of Exchange Facilities**

AT&T argues that the IURC erroneously concluded that "Sprint could use TELRIC-priced entrance facilities to exchange all types of traffic, as long as Sprint exchange[s] at least some telephone exchange service and/or exchange access service over a given interconnection facility." (Filing No. 28 at 8-9.) AT&T contends that the IURC's decision misapplies federal law, because

the Seventh Circuit has already conclusively determined this issue, and the IURC's decision fails to follow the Seventh Circuit's mandate. (Filing No. 28 at 8-10.) AT&T also argues that, even absent the Seventh Circuit precedent, the IURC's determination nonetheless misapplies federal law. (Filing No. 28 at 11-14.) The Defendants respond that the precedent cited by AT&T does not apply here, and that the IURC's determination does not conflict with federal law or regulation. (Filing No. 30.) The Court reviews this issue *de novo*, as it is a question of whether the IURC properly applied federal law.

Generally, AT&T challenges the IURC's finding regarding whether Sprint would be permitted to exchange traffic other than telephone exchange service and exchange access traffic between the parties' end-user customers at TELRIC-priced entrance facilities. AT&T contends that the Seventh Circuit directly addressed this issue in *SprintCom,* an opinion that was issued prior to the IURC's determination in this case. (Filing No. 28 at 9-11.) The Defendants contend that *SprintCom* is not determinative here. (Filing No. 31 at 8-9; Filing No. 30 at 15-17.)

This case and the *SprintCom* case have proceeded along parallel tracks. As this matter was being arbitrated in Indiana, a similar matter involving AT&T and Sprint was being arbitrated in Illinois. *SprintCom, Inc. v. Scott*, 2014 WL 6759714, at *2 (N.D. Ill. Dec. 1, 2014), *aff'd SprintCom,* 790 F.3d.[2] There, as here, Sprint sought a determination that it could use TELRIC-priced interconnection facilities to exchange multiple types of traffic—not merely traffic between the parties' end users. Sprint specifically argued that it should be permitted to exchange traffic that passed between an interexchange carrier (a long-distance carrier) and a Sprint end-user over AT&T's interconnection facilities at TELRIC rates.

---

[2] The district court decision is short-cited here for clarity under the party-name "*Scott*".

That issue reached arbitration, and the Illinois Commerce Commission ("ICC") concluded that calls between Sprint customers and interexchange carriers did not qualify as Section 251(c)(2) traffic. *Scott,* 2014 WL 6759714, at *2. Sprint appealed the decision of the arbitrator to the Northern District of Illinois. The district court presented the issue as follows:

> whether AT&T, as an incumbent, was obligated to provide interconnection to Sprint at lower, cost-based rates known as TELRIC … for calls that Sprint sought to route through AT&T's network but actually originated from an "end-user" on a third-party long-distance carrier, or interexchange carrier (also referred to as an IXC). Resolution of this issue affected Sprint's ability to use the interconnection facilities (comprised of call-routing hardware, such as switches) that enable the calls to be physically sent through AT&T's networks at cost-based rates…

*Id*. The district court upheld the decision of the ICC, finding that:

> '[t]elephone exchange service' is defined as 'service *within* a telephone exchange, or within a connected system of telephone exchanges *within* the same exchange area,' and exchange access as the 'offering of access' thereto. … Thus, the interconnection duty as articulated by the Act applies only in the context of local traffic *within* exchange areas, as distinct from interexchange traffic.

*Id.* at *4 (emphasis in original). The court reasoned that "while § 251(c)(2) outlines incumbents' interconnection obligations vis-à-vis local-exchange competitors, a separate provision, § 251(g), specifically addresses interconnection requirements to allow access by interexchange carriers." *Id*. And that provision, in contrast to the competitive-local-exchange-related obligations, "provides that each incumbent 'shall provide exchange access, information access, and exchange services for such access to interexchange carriers with the same ... restrictions and obligations [as in effect prior to the Act].'" *Id.* (citing 47 U.S.C. § 251(g)). In other words, the statute itself provides separately for the treatment of interexchange carriers, distinct from local exchange obligations.

Sprint appealed the district court's determination, again arguing that the statute allows them to transmit non-local exchange traffic at TELRIC rates. The Seventh Circuit's discussion of the issue is reproduced in its entirety:

The second argument that Sprint presses on us is that as long as some of its traffic carried by Illinois Bell qualifies for TELRIC pricing (that is, traffic from Sprint customers to subscribers to Illinois Bell or other local exchange carriers in the same exchange area as Sprint—i.e., Illinois), Sprint can piggyback nonqualifying traffic on that qualifying traffic, thereby, it argues, making the nonqualifying traffic qualifying. In support Sprint unguardedly cites a regulation which states that "a carrier that requests interconnection [with a local exchange carrier such as Illinois Bell] solely for the purpose of originating or terminating its interexchange traffic [to the customers of such a carrier] ... is *not* entitled to" interconnection at TELRIC rates, 47 C.F.R. § 51.305(b) (emphasis added), unless it demonstrates that such free riding is necessary to enable it to compete. Sprint, which has not so demonstrated, interprets the provision to mean that the converse must be true—that as long as it's not using the interconnection *solely* for interexchange traffic it's entitled to TELRIC rates for all traffic. There's no basis for that interpretation.

*SprintCom*, 790 F.3d at 757 (emphasis in original). The Seventh Circuit affirmed the district court's determination as to the interconnection facilities.

The issue disputed by the parties here is whether the Seventh Circuit's resolution of the issue in *SprintCom* determines the outcome here. The Defendants argue, and the IURC determined, that as long as Sprint is not using the interconnection *solely* for interexchange traffic (or other traffic that is not exchange service or exchange access), then it is entitled to TELRIC rates for all traffic passed through that interconnection. They cite 47 C.F.R. § 51.305(b) in support of that proposition, and the IURC relied on that regulation in making its determination. But the Seventh Circuit explicitly rejected the Defendants' proposed interpretation of the Act in *SprintCom* (including Regulation 51.305(b)), stating that such an interpretation was baseless. The Court concludes that the same is true here, and the Seventh Circuit's prior ruling on the issue is controlling.

The Defendants argue that *SprintCom* is distinguishable, framing the issue here as whether federal law *prohibits* interconnection facilities from hosting interexchange traffic at TELRIC rates, and the issue in *SprintCom* as whether federal law *required* AT&T to provide Sprint cost-based interconnection facilities for interexchange traffic. That proposed framing obscures what was at

issue in both cases: whether AT&T can be *compelled* to provide TELRIC rates for the "mixed-purpose" use of its interconnection facilities. The Seventh Circuit directly addressed this question in *SprintCom*, and found that such compulsion is not permitted by the statute.

Thus, the IURC applied an erroneous interpretation of federal law, and its decision on this issue is **REVERSED.**

### B.     <u>Applicable Rate</u>

The IURC also concluded that AT&T would be required to bear 50% of the cost of entrance facilities that Sprint obtains from AT&T. (Filing No. 24-8 at 33.) AT&T argues that this determination is contrary to federal law, because, under the Telecommunications Act, Sprint is required to pay the full TELRIC rate for use of interconnection facilities. (Filing No. 28 at 7.) The Defendants argue that federal law does not prohibit the imposition of a cost-sharing agreement, and that such an agreement does not impact that *rate* that Sprint is *charged;* rather, it only impacts the final *amount* that Sprint *pays.* (Filing No. 30 at 22-23; Filing No. 31 at 13-14.) The Court reviews this issue *de novo*, because again, it is a question of whether the IURC properly applied federal law.

In support of the IURC's decision, the Defendants argue that (1) the Supreme Court has left open the question of whether cost-sharing may be imposed on interconnection facilities; and (2) FCC regulations have contemplated cost-sharing. The Defendants argue that cost-sharing was codified in FCC Rule 51.703(b), which prohibits a LEC from assessing charges on interconnecting carriers for calls originating on the LEC's network (Filing No. 31 at 12); *see also In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996,* First Report & Order, 11 FCC Rcd. 15499, ¶ 1062 (1996). They also point to *TSR Wireless, LLC v. US West*

*Commc'ns, Inc.,* 15 FCC Rcd. 11166, ¶ 31 (2000), as establishing that AT&T is required to absorb some of the cost of interconnection facilities leased to competitors.

AT&T responds that all of the authorities cited by the Defendants involve the rules regarding "transport and termination" of communications traffic, governed by 47 U.S.C. § 251(b)—not the use of entrance facilities as governed by 47 U.S.C. § 251(c).  AT&T, citing *Talk America*, contends that the Supreme Court has conclusively determined that "transport and termination of traffic" is subject to different regulatory treatment than interconnection, and that any cost-sharing that may be applicable in that context is inapplicable in the interconnection context.  ([Filing No. 28 at 15](#), citing *Talk America*, 564 U.S. at 63.)

The Court agrees with AT&T that the Supreme Court has concluded that "transport and termination of traffic" is subject to different regulatory treatment than interconnection.  *See Talk America,* 564 U.S. at 63 ("…'transport and termination of traffic' is subject to different regulatory treatment than interconnection. Compensation for transport and termination—that is, for delivering local telephone calls placed by another carrier's customer—is governed by separate statutory provisions and regulations.").  The Court therefore looks first to the statutory text to determine whether the cost-sharing measures approved in the context of transport and termination of traffic may be properly applied in the interconnection context.

The provisions regarding the transport and termination of traffic specifically provide for reciprocal compensation.  Section 251(b)(5), regarding the "obligations of all local exchange carriers," imposes upon them the "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."  47 U.S.C. § 251(b)(5).  Section 252(d)(2) also describes the elements that must be considered by a state commission when determining whether

the terms and conditions for reciprocal compensation are "just and reasonable."   47 U.S.C.
§ 252(d)(2).

The provisions pertaining to interconnection, however, do not explicitly refer to reciprocal
compensation.  Section 251(c)(2)(D) specifies that ILECs have a duty to provide interconnection
with the local exchange network "on rates, terms, and conditions that are just, reasonable, and
nondiscriminatory, in accordance with the terms and conditions of the agreement and the
requirements of this section and section 252 of this title."   47 U.S.C. § 251(c)(2)(D).   Section
252(d)(1) establishes the pricing standards for "interconnection and network element charges,"[3]
and the FCC ultimately promulgated regulations to implement these pricing standards—the
TELRIC rates.  *Verizon Communications, Inc. v. F.C.C.,* 535 U.S. 467 (2002).  The statute, on its
face, does not provide for the imposition of cost-sharing in determining the compensation to be
paid for use of interconnection facilities.

That Congress provided for reciprocal compensation in another provision of the same
statute supports the conclusion that it did not intend to authorize cost-sharing where it did not
explicitly mandate it.  *See, e.g., Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't
of Transp.,* 840 F.3d 879, 891 ("Congress knows how to require rule-makers to follow cost-benefit
analyses when it wants…"); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 522-23 (1984)
("Congress knew how to draft an exclusion for collective-bargaining agreements when it wanted

---

[3] (1) Interconnection and network element charges

Determinations by a State commission of the just and reasonable rate for the interconnection of facilities and
equipment for purposes of subsection (c)(2) of section 251 of this title, and the just and reasonable rate for network
elements for purposes of subsection (c)(3) of such section--
**(A)** shall be--
    **(i)** based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of
    providing the interconnection or network element (whichever is applicable), and
    **(ii)** nondiscriminatory, and
**(B)** may include a reasonable profit.

to; its failure to do so in this instance indicates that Congress intended that § 365(a) apply to all collective-bargaining agreements covered by the NLRA.").

In addition, the regulations regarding the development and application of TELRIC rates are particularly comprehensive, and do not include any contemplation of the imposition of cost-sharing in addition to the already-discounted rates.[4]   When the FCC initially developed and mandated the TELRIC pricing methodology, a number of state commissions and ILECs challenged its order, on the basis that the FCC was usurping the state commissions' ability to adopt the pricing methodologies they deemed appropriate.  *See Iowa Utils. Bd. v. FCC,* 109 F.3d 418 (8th Cir. 1996). Ultimately, the Supreme Court determined that the FCC had the authority to mandate the comprehensive TELRIC regime, with the states limited to "apply[ing] those standards and implement[ing] that methodology, determining the concrete result in particular circumstances." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 384 (1999).  The comprehensive nature of the regulatory regime, and the Supreme Court's treatment of it, counsel against a finding that Section 251(c)(2) and related provisions contemplate or permit cost-sharing.

Finally, the Court is not persuaded by the Defendants' argument that cost-sharing does not impact that rate that Sprint is charged—only the final amount that Sprint pays.  The Defendants have not suggested that the cost-sharing would involve parties other than Sprint and AT&T—*i.e.* the two parties contemplated by the TELRIC computation.  Nothing in the statute or regulations suggests that Congress or the FCC considered that the *rate charged* might not correspond to the *amount paid*.  It is difficult to see cost-sharing in this context as anything other than an attempted end-run around the TELRIC rates.  The Court is likewise not convinced by the Defendants' argument that it is only natural for AT&T to bear some of the cost of the interconnection facilities,

---

[4] The Court notes that the TELRIC rates have been referred to as "just above the confiscatory level."  *SprintCom,* 790 F.3d at 754, citing *Verizon,* 535 U.S. at 489.

given that AT&T's traffic also passes through them.  Interconnection, by regulatory definition, is the "the linking of two networks for the *mutual exchange of traffic*."  47 C.F.R. § 51.5 (emphasis added).  Therefore, the statute and regulations already account for the fact that AT&T will use the interconnection facilities.

For these reasons, the Court concludes that the IURC erred when it imposed a cost-sharing arrangement, and the IURC's finding is **REVERSED**.

## IV.   CONCLUSION

For the reasons stated above, the Court concludes that the IURC applied an erroneous interpretation of federal law, and its decision on the issue of use of exchange facilities is **REVERSED.** In addition, the Court concludes that the IURC erred when it imposed the cost-sharing arrangement, and the IURC's findings on this issue is **REVERSED**.  This matter is **REMANDED** to the IURC with instruction that the interconnection agreement ("IAC") be reformed consistent with this Entry. In addition, the Court enjoins enforcement of the erroneous terms until the ICA has been reformed.

**SO ORDERED.**

Date:  3/27/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brian D. Robinson
AT & T INDIANA
br5328@att.com

Alan S. Townsend
BOSE MCKINNEY & EVANS, LLP
atownsend@boselaw.com

Briana Lynn Clark
BINGHAM GREENEBAUM DOLL LLP
bclark@bgdlegal.com

Nikki Gray Shoultz
BOSE MCKINNEY & EVANS, LLP
nshoultz@boselaw.com

Philip R Schenkenberg
BRIGGS AND MORGAN, P.A.
pschenkenberg@briggs.com


Patricia Caress McMath
INDIANA ATTORNEY GENERAL
patricia.mcmath@atg.in.gov

Jeremy R. Comeau
INDIANA UTILITY REGULATORY
COMMISSION
jcomeau@urc.in.gov

Beth Krogel Roads
INDIANA UTILITY REGULATORY
COMMISSON
bkroads@urc.in.gov

Dennis G. Friedman
MAYER BROWN LLP
dfriedman@mayerbrown.com

Hans J. Germann
MAYER BROWN LLP
hgermann@mayerbrown.com